# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

## WESTERN DIVISION

UNITED STATES OF AMERICA

v.                                              Case No.: 3:07CR192-NBB-SAA

RICHARD F. SCRUGGS,
DAVID ZACHARY SCRUGGS,
SIDNEY A. BACKSTROM

## DEFENDANTS' MOTION TO DISMISS THE INDICTMENT FOR OUTRAGEOUS GOVERNMENT CONDUCT WITH COMBINED MEMORANDUM OF LAW

### I.        INTRODUCTION

Last March, attorney Timothy R. Balducci met with Third Circuit Court Judge Henry L. Lackey to discuss a case pending before the Judge. This *ex parte* contact set in motion a chain of events, during which the federal government used Judge Lackey to create a crime for Balducci, who then also turned government agent and was employed to try to expand the reach of the manufactured crime to include defendants Richard F. Scruggs, David Zachary Scruggs, and Sidney A. Backstrom. Not only did the government pursue Balducci to the point of manufacturing a crime for him, but it also engaged in a pattern of concealing from this Court the excessive government involvement in the alleged crime along with relevant exculpatory information in order to procure wiretap orders and search warrants which forth fueled the government's efforts to implicate others in the manufactured crime.

Defendants Dick Scruggs, Zach Scruggs, and Sid Backstrom come now to move that the Court dismiss the Indictment due to the government's outrageous conduct in pursuing its investigation. "[T]he due process clause prohibits outrageous conduct by law enforcement agents…." *United States v. Duvall*, 846 F.2d 966, 973 (5th Cir. 1988); *United States v. Yater*, 756 F.2d 1058, 1064 (5th Cir. 1985). Here, defendants are truly faced with "a situation in which

the conduct of law enforcement agents is so outrageous that due process principles … absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32 (1973).

In several recent high-profile cases, the government's over-zealous investigation has caused courts across the country to dismiss prosecutions due to the government's outrageous and overreaching conduct. *See, e.g.*, *United States v. Stein*, 495 F. Supp. 2d 390, 415 (S.D.N.Y. 2007) (dismissing indictment against thirteen defendants because government's pressure on corporate target to cut off payment of their attorneys' fees "shock[ed] the conscience" and amounted to "outrageous government conduct."); *United States v. Stringer*, 408 F. Supp. 2d 1083, 1089 (D. Or. 2006) (dismissing indictment because government's use of parallel civil proceeding to gather evidence for criminal case was "so grossly shocking and so outrageous as to violate the universal sense of justice."); *United States v. Scrushy*, 366 F. Supp. 2d 1134, 1140 (N.D. Ala. 2005) (dismissing perjury counts because the government "undoubtedly manipulated" simultaneous civil and criminal proceedings). The Court should do the same here.

## II. BACKGROUND

On March 15, 2007, Grady F. Tollison, Jr., an attorney for the law firm of Jones, Funderburg, Sessums, Peterson & Lee, LLC, filed under seal a lawsuit in the Circuit Court of Lafayette County against Richard F. Scruggs, the Scruggs Law Firm and the other member firms of what was then known as the Scruggs Katrina Group ("SKG"). *See* Ex. 1.[1] Jones, Funderburg had been a member of the SKG. The parties' dispute arose out of the distribution of attorneys' fees awarded in connection with SKG's settlement of several hundred lawsuits against State Farm. *Id*. The *Jones* case was assigned to Judge Henry Lackey.

---

[1] All Exhibits ("Ex.") cited herein are exhibits to the Declaration of Brook Dooley in Support of Defendant's Motion to Dismiss Indictment for Outrageous Government Conduct and Motion to Suppress the Fruits of Illegal Wiretaps and Searches ("Dooley Decl.") filed herewith.

On the same day the case was filed, Tollison sent defendants a letter with a copy of the complaint demanding that the case be settled or the complaint would be unsealed. Tollison wrote:

> Without a flow of communications, negotiations have stalled. Unless this matter can be resolved by Monday, March 19, at 4:30 p.m., we will move the Court to unseal the Complaint and will move forward with issuing the summonses.

Ex. 2.

The circumstances surrounding the filing of the *Jones* complaint were unusual. Judge Lackey entered an order sealing the complaint the same day it was filed. Ex. 3. The sealing order indicates that the request to seal was made "on motion *ore tenus*," that is, on an oral motion. *Id.* Judge Lackey ordered that the complaint be kept under seal without docketing until 4:30 PM on Monday, March 19, 2007, and allowed that the complaint could be unsealed at the sole request of Tollison and without further court order. *Id.* Finally, the order anticipated that the complaint might be dismissed prior to March 19, 2007. *Id.*

On March 19, 2007, the defendants moved to stay the court case and send the dispute to neutral arbitration pursuant to a broadly worded arbitration clause in SKG's joint venture agreement. Ex. 4. The Mississippi Supreme Court has adopted a strong presumption in favor of arbitration and has directed that any doubt regarding enforceability of an arbitration agreement should be resolved in favor of arbitration. *Doleac v. Real Estate Professionals*, LLC, 911 So. 2d. 496, 504 (Miss. 2005). Here, there was little doubt about whether this case was going to be sent to arbitration. The SKG's joint venture agreement provided that "Any dispute arising under or relating to the terms of this agreement shall be resolved by *mandatory binding arbitration*, conducted in accordance with the guidelines of the American Arbitration Association." Ex. 1 at 19-24 (emphasis in original).

Some time after the *Jones* case was filed, attorney Timothy R. Balducci and Steven A. Patterson talked to Dick Scruggs, Zach Scruggs, and Sid Backstrom about the *Jones* case and Judge Lackey. Balducci and Patterson (who is not a lawyer) had opened a law firm in January 2007 after years of working under Joseph C. Langston at the Langston Law Firm. Ex. 5.

Balducci and Patterson had ambitious plans for their law firm, planning to open an office in Washington, DC along with their offices in New Albany and Oxford. Ex. 25 at 3. Balducci had done legal work for the Scruggs Law Firm in the past and sought to build his new firm in part by trading on his acquaintance with Dick Scruggs and the Scruggs Law Firm. *Id.* He joined the Scruggs Law Firm as co-counsel in some cases and, in other cases, represented to potential clients that he could enlist the assistance of the Scruggs Law Firm. In trying to build their new firm, Balducci and Patterson also reached out to many retired judges and state officials to hire them on an "of counsel" basis, lending their name to the firm's letterhead in exchange for modest compensation. Ex. 5. Notwithstanding Balducci and Patterson's aggressive promotion of their firm, Patterson & Balducci was in financial trouble throughout its existence.

There was never an agreement between Balducci, Patterson, and defendants to attempt to corruptly influence Judge Lackey. Patterson, who was at the March meeting with Balducci and defendants, recently confirmed this before the Court: "I never set out to corruptly bribe a judge. I never set out … when this thing started, to do anything of that nature …. [F]rom the outset, there was no intent on my part to ever corruptly influence anyone." Ex. 7 at 9. Rather, Balducci had known Judge Lackey for a long time, Judge Lackey had served as a mentor figure for Balducci, and Judge Lackey respected Balducci. Ex. 8.

On March 28th, Judge Lackey agreed to meet with Balducci. During the course of their meeting, Judge Lackey and Balducci talked about the *Jones* case. Ex. 9. Balducci mentioned to the Judge that he would consider it a personal favor if the Judge would dismiss what he considered to be slanderous and personal allegations in the complaint and send the remainder of the case to arbitration. *Id.* About five weeks later, on May 4th, Balducci faxed Judge Lackey a draft order that would have sent the *Jones* case to arbitration. *Id.* In a phone call the same day, Balducci told Judge Lackey the draft order was "Just some thoughts, ideas, and suggestions … I thought I'd put on paper … see if His Honor … might be interested in." Ex. 10 at 2.

During their March 28th meeting, Balducci also talked to Judge Lackey about Patterson & Balducci, the law firm he had opened with Steve Patterson. Ex. 9. Balducci asked Judge

Lackey about his plans for after he retired from the bench and inquired whether the Judge might be interested in coming to work for his firm as another "of counsel" attorney. *Id*. At that time, a number of retired judges and state officials had already come to work "of counsel" for Patterson & Balducci. Ex. 5. Retired Magistrate Judge Gillespie, Judge Rodney Shands, and Former Gov. Bill Allain were all "of counsel" at Patterson & Balducci at that time. *Id.*

Sometime in April, Judge Lackey called the United States Attorney's Office to discuss his meeting with Balducci. Defendants can only guess at why Judge Lackey called the government days after he met with Balducci, but it appears that something Balducci said may have made Judge Lackey believe that he was the target of an investigation or government sting. In an interview Judge Lackey gave to the Wall Street Journal that ran two days after the Indictment was filed, Judge Lackey said that his "first thought" was: "What kind of character flaw has [Balducci] discovered in me that would lead him to think that I would do something like this?" Ex. 8.

Whatever his motives for contacting the U.S. Attorney's office, after his discussion with the government in April 2007, Judge Lackey began to function and act as the government's agent in pursuing Balducci. And Judge Lackey pursued Balducci vigorously. Between their May 4, 2007 telephone call and their September 21st meeting at which Judge Lackey finally demanded $40,000 from Balducci, Judge Lackey called Balducci no fewer than seven times. Dooley Decl. ¶ 1. During the same time period, Balducci does not appear to have called Judge Lackey once— even to return a phone call. *Id*. On the occasions when he was able to get Balducci to talk to him, Judge Lackey repeatedly interjected the topic of the *Jones* case and the draft order that Balducci had sent him. *See, e.g.,* Ex. 11 at 15; Ex. 12 at 3; Ex. 13 at 4. Balducci, on the other hand, never introduced the topic of the *Jones* case or the order. Moreover, during this same four-and-a-half month stretch, Balducci never mentioned the "of counsel" position at Patterson & Balducci in the context of the *Jones* case.

Indeed, Balducci was apparently so indifferent to the *Jones* case and the motion to compel arbitration that he did not call Judge Lackey to ask about his curious recusal—and then

"un-recusal"—from the case. On May 21, 2007, three days before the scheduled hearing on the motion to compel arbitration, Judge Lackey issued a letter to the parties, announcing that he intended to recuse himself from hearing the case altogether. Ex. 14. Balducci, however, did not call Judge Lackey to ask about his recusal or to ask that he reconsider. Dooley Decl. ¶ 2. In fact, the two did not speak at all, for eight days. *Id*. Then, on May 29th, Judge Lackey called Balducci. Judge Lackey explained that he had recused himself because he had been seen at a court function speaking with a member of the Daniel Coker firm, which represented the defendants in the *Jones* case. *Id* at ¶ 3. Again, Balducci did not to try to dissuade Judge Lackey or otherwise convince him to stay in the case. *I* . To the contrary, Balducci told Judge Lackey that he should "do what your heart tells you." *Id*. Then, several days later, Judge Lackey sent a notice that he was withdrawing his recusal. Ex. 15. Again, Balducci did not call Judge Lackey to talk about this decision to hear the *Jones* case after all.

From all that appears, Balducci considered his work on the *Jones* matter done as of May 4, 2007. He had talked to Judge Lackey about sending the case to arbitration as a favor to him and had sent the Judge some draft language to look at. Thereafter, he did not call Judge Lackey to discuss the *Jones* case or the motion to compel arbitration, and, when Judge Lackey called him, he never raised the issue of the order of the *Jones* case. Indeed, on the few occasions when Judge Lackey was able to engage Balducci in a discussion about the *Jones* case, Balducci made it clear that he only wanted Judge Lackey to do what the law required in the case. For example, when Judge Lackey called Balducci on August 9, 2007, and tried to implicate Scruggs by asking if Scruggs wanted the case sent to arbitration, Balducci responded "yes sir … if … after you [see] it …. If you [see] it that way, that'd be terrific." Ex. 11 at 15-16.

Notwithstanding that Balducci had long since let the issue of the *Jones* case lie dormant, in September 2007, the government and its agent Judge Lackey decided to instigate the crime with which defendants are now charged. On September 18, 2007, Judge Lackey called Balducci and, out of the blue, using hushed, conspiratorial tones, told Balducci that he had something to say that might shock Balducci. Ex. 12 at 2. Judge Lackey then asked whether, if he helped the

defendants in the *Jones* case, they would help him. *Id.* at 5. Then, on September 21st, Judge Lackey upped the ante. He told Balducci that he needed $40,000 to take care of a problem that he had and that he needed it by the first of October. Ex. 16 at 11. Shocked and surprised, Balducci agreed, telling Judge Lackey: "Well … what I'ma do is I'm gonna take care of it and you just let me take care of it …." *Id.* at 12. Later, Balducci reiterated that he would help Judge Lackey: "I want you to know I'm in a position to help, and I wanna help and I'm gon' help...." *Id.* at 36. Three days later, (on September 24, 2007) Judge Lackey called Balducci again, this time to pressure him to agree to the payment. Judge Lackey asked Balducci, "I hate to even bug you …. Can I commit to my folks that are pressurin' me, something … by the weekend?" Ex. 17 at 4. After Balducci assured Judge Lackey he was going to be able to help him, Lackey said "I appreciate it. I'll sleep tonight …." *Id.* at 5. The government had thus set in motion an entirely made-up criminal scheme.

The crime that the government created, however, did not involve Scruggs or the Scruggs Law Firm. And the government knew this. On September 27, 2007, the day that Balducci delivered the first installment of the $40,000 payment demanded by Judge Lackey, Balducci told Judge Lackey three times that Scruggs was not involved and would never know what had transpired between them.

- Judge Lackey told Balducci "if this is not … Mr. Scruggs' money, I don't want a nickel of it." Ex. 18 at 7. Balducci responded: "I want you to know … **this is between me and you, and just between me and you** … **this is just between me and you** … **there ain't another soul in the world that knows about this** …." *Id*. at 9-10.

- Then, in an attempt to implicate Scruggs, Judge Lackey responded, "I would think Mr. Scruggs would have to know something …." *Id*. Balducci responded that it was not going to work like that. Rather, Balducci said that all that Scruggs would know is that "I solved a problem for him." *Id*.

- Later, after Judge Lackey again interjected Scruggs's name, Balducci cut him off and said "**He's not even involved at that level Judge …. He's not involved in a direct manner**, doesn't wanna be. Doesn't need to be." *Id*. at 22-23.

Despite the fact that the government knew that Scruggs was not involved in the alleged conspiracy that it had set in motion, the government continued to pursue Scruggs, all the while concealing from this Court its role in creating the crime as well as facts exculpatory to defendants. In his affidavit in support of the September 25, 2007 application for a wiretap on Balducci's telephone,[2] FBI Special Agent William P. Delaney failed to describe Judge Lackey's aggressive pursuit of Balducci and omitted numerous statements available to him from Judge Lackey recordings that showed that there was never a *quid pro quo* agreement between Judge Lackey and Balducci. For example, Delaney failed to mention that Balducci stated that the "of counsel" position and the *Jones* case were "not connected … one thing is not connected the other," Ex. 16 at 36, and failed to mention that Balducci told Judge Lackey that he should only grant the *Jones* defendants' motion "yes sir … if … after you [see] it …. If you [see] it that way," Ex. 11 at 15-16. Similarly, in his October 16, 2007 affidavit in support of the government's application for a wiretap on Steven Patterson's telephone, Delaney claimed that the wiretap was necessary to intercept communications with co-conspirators and averred that there was probable cause to believe that Balducci, Scruggs, and others were conspiring to bribe Judge Lackey. Ex. 19. Yet Agent Delaney omitted entirely any mention of Balducci's comments on September 27th to the effect that Scruggs was "not even involved." Ex. 18 at 22-23.

Finally, in November 2007, the government reverted to the same strategy to implicate defendants that it had used on Balducci: it tried to create the crime. On November 1, 2007, after Balducci had paid Lackey the last of the $40,000 that Lackey had demanded, the government

---

[2] As discussed in greater detail in defendants' Motion to Suppress, filed herewith, the Delaney affidavit that was submitted in support of the application for a wiretap on Balducci's telephone was not signed until September 26th, the day after the application and order authorizing the wiretap were signed and filed.

confronted Balducci with the evidence implicating him in the made-up extortion scheme. Ex. 20 at 5. The government then sent Balducci to the Scruggs Law Firm wearing a bodywire and carrying a mandate to implicate members of the Scruggs Law Firm in the made-up criminal scheme. Evidently not satisfied with the fruits of this intrusion, the government instructed Balducci to call Backstrom on November 13, 2007 with yet a further entirely made up criminal proposal. On November 28, 2007, the seed that the government planted in the Spring and cultivated over the course of the Summer and Fall finally bore its bitter fruit. Defendants were charged in a six-count indictment with conspiracy, bribery, and honest services wire fraud.

## III. ARGUMENT

### A. Government over-involvement in the charged crime offends due process and requires dismissal.

The investigation, indictment, and prosecution of the defendants in this case offends the Fifth Amendment because the alleged crime was created by the government and its agents, first Judge Henry Lackey and then Timothy R. Balducci. Under the Due Process Clause, prosecution is barred where "[p]olice overinvolvement in crime … reach[es] a demonstrable level of outrageousness …." *Hampton v. United States*, 425 U.S. 484, 495 (1976); *see also Russell*, 411 U.S. at 431-432. As Justice Roberts wrote more than 75 years ago, the "courts must be closed to the trial of a crime instigated by the government's own agents" *Sorrells v. United States*, 287 U.S. 435, 459 (1932) (Roberts, J., concurring).

The courts have repeatedly dismissed indictments where "governmental involvement in the criminal activities … reached a demonstrable level of outrageousness." *United States v. Twigg*, 588 F.2d 373, 380 (3d Cir. 1978); *see also, United States v. Greene*, 454 F.2d 783, 787 (9th Cir. 1971); *United States v. Gardner*, 658 F. Supp. 1573, 1577 (W.D. Pa. 1987); *United States v. Batres-Santolino*, 521 F. Supp. 744, 753 (N.D. Cal. 1981). In *Twigg*, for example, the Third Circuit reversed a conviction for conspiring to manufacture illegal drugs because the government "implanted the criminal design in [the defendant's] mind … set him up, encouraged

him …, and when he and [his codefendant] encountered difficulties in consummating the crime, they assisted in finding solutions." 588 F. 2d at 381.

The Fifth Circuit has long recognized that "governmental participation may be so outrageous or fundamentally unfair as to deprive the defendant of due process of law…." *United States v. Graves*, 556 F.2d 1319, 1322 (5th Cir. 1977). Dismissal is warranted where defendants show "proof of government *overinvolvement* in the charged crime and proof of the defendant's mere passive connection to the government orchestrated and implemented criminal activity." *Duvall*, 846 F.2d at 973-74 (citation omitted; emphasis in original).

"[O]utrageous involvement turns upon the totality of the circumstances with no single factor controlling." *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir. 1981). Among the factors the Fifth Circuit has considered is whether the alleged criminal "scheme was … suggested by the government," *United States v. Jones*, 839 F.2d 1041, 1053 (5th Cir. 1988) (emphasis in original), and whether the government pursued its target with "repeated phone calls and encouragement." *Tobias*, 662 F.2d at 387. Unlike in the entrapment context, "a claim of outrageous government conduct … focuses on the *actions of government agents* …." *Slattery v. United States*, 2005 WL 2416339, *9 (N.D. Miss. Sept. 30, 2005); *see also United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991) ("The outrageousness of the government's conduct must be viewed 'standing alone' and without regard to the defendant's criminal disposition …."(citation omitted)). A claim of outrageous government conduct "does not present any question of fact for the jury. It is solely a question of law for the court." *Slattery*, 2005 WL 2416339 at *9.

**B.      The government created the crime alleged in the Indictment.**

**1.      March 28, 2007-May 4, 2007:  Balducci asks Lackey to dismiss the *Jones* case as "a personal favor" and sends him a draft order.**

The absence of a pre-existing criminal scheme is critical to understanding the outrageous nature of the government's conduct. In *Twigg*, a key factor in reversing the defendants' conviction for operating a drug laboratory was the fact that the government's investigation "was

not concerned with an existing laboratory." *Twigg*, 588 F.2d at 381. In *Gardner*, which also reversed a conviction, the court noted that up until the time the government initiated the crime, "the defendant was not involved in any prior ongoing criminal activity." *Garnder*, 658 F. Supp. at 1576. Similarly, in *Batres-Santolino*, the court found that "there was no organization until the acts of the [confidential informant] and the DEA persuaded defendants to create one." *Batres-Santolino*, 521 F. Supp. at 751.

Similarly, before the government instructed Judge Lackey to ask Balducci for $40,000, there was no pre-existing scheme to provide cash—or anything else of value—to Judge Lackey in return for a favorable ruling in the *Jones* case. Balducci first contacted Judge Lackey by telephone on March 28, 2007 and the two met on the same day. There is no evidence that during this meeting, Balducci offered anything of value to Judge Lackey in exchange for a ruling in the *Jones* case. In fact, it is evident that Balducci did *not* contemplate a *quid pro quo* of any kind. According to Agent Delaney's affidavit dated September 26, 2007, "Mr. Balducci … told [Judge Lackey] he would *consider it a personal favor* if the judge would enter an order dismissing the 'vicious and almost slanderous and personal allegations or complaints' and the remainder of the lawsuit could be sent to arbitration." Ex. 9 at 3.

According to Agent Delaney's affidavit, Balducci told Judge Lackey "that he had something he wanted to 'run by the judge' and stated that when Judge Lackey 'got ready to lay down the gavel, hang up your robe' that he wanted the judge to consider becoming 'of counsel' with his firm." *Id*. There is no indication, however, that Balducci's comment regarding Judge Lackey becoming "of counsel" was connected to the *Jones* case in any way, and there is not even any indication that Balducci mentioned the "of counsel" position in the context of a discussion about the *Jones* matter. Indeed, Balducci had offered "of counsel" positions to numerous judges, state officials, and others in the course of building up his law firm. Ex. 5. There is thus no reason to think that Balducci would have offered an "of counsel" position to Judge Lackey only on the condition that Judge Lackey rule in favor of the defendants in the *Jones* case.[3]

---

[3] It is also of note that it took Judge Lackey a few days to contact the government about his

Moreover, there was nothing all that unusual about Balducci meeting with Judge Lackey to discuss the *Jones* case.[4] Indeed, the evidence suggests that Judge Lackey may have had *ex parte* contacts with other lawyers in the *Jones* case on at least two occasions. The circumstances of the filing of the under seal complaint suggest that Judge Lackey may have had *ex parte* communications with Grady Tollison, the attorney for the plaintiff, before the case was filed. And during a recorded call between Judge Lackey and Balducci on September 18, 2007, Judge Lackey told Balducci that Tollison "was puttin' some pressure … to get this thing done." Ex. 12 at 6. Indeed, the fact that the Mississippi Uniform Rules of Court address this kind of communication—colloquially known as "earwigging"—strongly suggests that the practice is common, even if frowned upon.

On May 4, 2007, Balducci faxed Judge Lackey a proposed order and called him later that day to discuss the draft order. This is the first conversation between Balducci and Judge Lackey for which the government has produced a recording.[5] There is nothing in the recording to

---

meeting with Balducci. *See* Ex. 8. The government previously suggested to this Court that Lackey immediately contacted the United States Attorney's Office after Balducci left his chambers on March 28, 2007. In his September 26th affidavit, after describing the content of Lackey and Balducci's discussion on March 28th, Agent Delaney writes: "At the conclusion of the meeting, Judge Lackey called the U.S. Attorney's office and reported the matter to two senior AUSAs." Ex. 9. This suggestion is misleading. In fact, Lackey told the Wall Street Journal, in an interview that ran two days after the Indictment was filed, that he waited "a few days" to call the government. Ex. 8.

[4] There is certainly nothing criminal about Balducci meeting with Lackey to discuss the *Jones* case. Defendants are unaware of any federal criminal prosecution based on an *ex parte* contact between an attorney and a court. Such contacts are the province of state ethics rules.

[5] There is also a reference in Agent Delaney's September 26, 2007 affidavit to a conversation between Balducci and Lackey on May 3, 2007. *See* Ex. 9. There is reason to doubt that a call actually occurred on this date, however. No recording of this call has ever been produced. Moreover, on Dec. 26, 2007, the government produced a CD containing a recording identified as May 3, 2007, and a recording identified as May 4, 2007. Ex 21. The two recordings, however, were identical and, from the fact that Balducci and Lackey are heard on the recording discussing the May 4th faxed order, it is evident that the recording was, in fact, made on May 4, 2007. This suggests that Agent Delaney's description in his September 26, 2007 affidavit of what he characterizes as a call on May 3rd may be based on the recording that was actually made on May 4th. The conclusion that Delaney based his description of the May 3rd call on the recording made on May 4th is strengthened by the fact that Delaney attributes to the May 3rd call an agreement between Lackey and Balducci to meet again on May 9, 2007. Ex. 9. Yet, there is a nearly identical conversation on the May 4th recording about agreeing to meet on May 9th, and there is no indication on the May 4th recording that Balducci and Lackey had previously discussed such a meeting date. Ex. 10.

suggest that Balducci had offered—or was offering—anything to Judge Lackey in exchange for entering the order. In fact, during their May 4th discussion, Balducci told Judge Lackey that the draft language he faxed was "Just some thoughts, ideas, and suggestions...I thought I'd put on paper...see if His Honor...might be interested in." Ex. 10 at 2.

Indeed, it would have made precious little sense for Balducci to attempt to bribe Judge Lackey to enter the draft order that Balducci faxed on May 4, 2007. The order granted the *Jones* defendants' motion to stay the case and compel arbitration. Ex. 9. This was a motion, however, that defendants were nearly certain to win in any event. Mississippi law, like federal law, strongly favors the enforcement of arbitration agreements. See *Doleac*, 911 So. 2d at 504. And the members of the Scruggs Katrina Group had entered into a broadly worded agreement that essentially required that, if a dispute arose between the SKG member firms regarding any aspect of the SKG's work, the parties would resolve their disagreement in arbitration. Ex. 1 at 21. Moreover, sending the case to arbitration was no guarantee of victory on the merits of the case; arbitration is a neutral forum in which the *Jones* plaintiffs may very well have prevailed.

### 2. May 4, 2007-September 18, 2007: Judge Lackey pursues Balducci in an unsuccessful attempt to create a crime.

For the next four and a half months, Balducci did not initiate contact with Judge Lackey, never raised with him the topic of the *Jones* case or the motion to compel arbitration, and never as much as suggested that Judge Lackey would get anything—an "of counsel" position or otherwise—in exchange for a favorable order. On the other hand, Judge Lackey, working as a government agent, doggedly pursued Balducci in an unsuccessful attempt to create evidence of a crime.

Judge Lackey pursues Balducci. In assessing whether the government's conduct is outrageous, the court must look at the extent to which the government instigated the alleged criminal scheme by initiating and repeating contact with the target. In *Tobias*, the Fifth Circuit denied the defendant's outrageous government conduct claim but found that the DEA's conduct "set the outer limits to which the government may go in the quest to ferret out and prosecute

crimes in this circuit." *Tobias*, 662 F.2d at 387. The key factor in *Tobias* was that the target continued to contact the DEA and that the "drug transaction would have stopped at any time that Tobias made no further calls." *Id.* The court, however, determined that the case would be different if "the DEA had pursued [the defendant] by repeated phone calls and encouragement." *Id.* In *Greene*, the court reversed the defendant's conviction, finding that during the course of the government's investigation, "[o]f the thirty-two letters, telephone calls and telegrams between [the agent] and either [of the defendants] … twenty-two were initiated by [the agent]." *Greene*, 454 F.2d at 785.

In this case, Judge Lackey initiated every communication with Balducci between May 4th and September 18th, calling him repeatedly even while Balducci refused to return his calls.

- May 4, 2007: Judge Lackey asks Balducci to come to his chambers to meet on May 9, 2007. Ex. 10 at 2-3.

- May 9, 2007: Judge Lackey and Balducci meet but make no plans to speak again. Ex. 22.

- May 21, 2007, 10:10 a.m.: Judge Lackey calls Balducci and leaves a message; Balducci does not call him back. Ex. 13 at 2.

- May 21, 2007, 2:10 p.m.: Judge Lackey calls Balducci and leaves another message; Balducci does not call him back. Ex. 13 at 2.

- May 21, 2007, 4:35 p.m.: Judge Lackey calls Balducci again at 4:35 and finally gets him on the phone. Ex. 13 at 3.

- May 25, 2007: Judge Lackey calls Balducci. Dooley Decl. ¶ 4.

- May 29, 2007: Judge Lackey calls Balducci. *Id.*

- May 30, 2007: Judge Lackey drives to New Albany, MS for lunch with Balducci. *Id.*

Thus, after their May 4th conversation, Judge Lackey repeatedly initiated calls and meetings that he knew were being recorded even though it appears that Balducci did not again call Judge Lackey again.

Balducci did not even call Judge Lackey when the judge announced that he was recusing himself from the *Jones* case on May 21, 2007, just three days before he was set to hear argument on the pending motions. Dooley Decl. ¶ 2.  Surely if Balducci and Judge Lackey had agreed on a *quid pro quo* exchange related to the disposition of the case, Balducci would have called Judge Lackey to discuss this surprising turn of events.  However, Balducci did not contact Judge Lackey.  Balducci only talked to Judge Lackey about his recusal eight days later when Judge Lackey called him on May 29th.  Dooley Decl. ¶ 5.  Similarly, if there had been a *quid pro quo* between Balducci and Judge, you would think that Balducci would have attempted to influence Judge Lackey to reconsider his recusal decision.  However, the opposite is true.  Balducci reiterated that the Judge should "do what your heart tells you…."  Ex. 13 at 7.

Over the next three-and-a-half months, there is no evidence that Balducci called Judge Lackey once.  Judge Lackey, though, continued to barrage Balducci with phone calls.

- June 28, 2007:  Judge Lackey drops in on Balducci at his office unannounced while wearing a body wire to record his conversation.  Dooley Decl. ¶ 6.

- August 3, 2007:  Judge Lackey calls Balducci.  Balducci does not call him back.  Ex. 11.

- August 9, 2007:   Judge Lackey calls Balducci.  *Id.*.

- August 27, 2007:  Judge Lackey calls Balducci twice.  Balducci does not call him back.  *Id.*.

- September 11, 2007:  Judge Lackey calls Balducci twice.  Balducci does not call him back.  Ex. 23.

At the same time that Judge Lackey was repeatedly calling Balducci, Judge Lackey held off ruling on the pending motions in *Jones*.  The motion to compel arbitration was first filed in March 2007, and the hearing was not held until July 17, 2007.  Ex. 4; Ex. 24.  Yet after the hearing, Judge Lackey still did not rule on the motion.  Then, on August 16, 2007, the Mississippi Supreme Court decided *Century 21 Maselle and Associates, Inc. v. Smith*, 965 So. 2d 1031 (Miss. 2007).  In *Century 21*, the Supreme Court reiterated in forceful terms the

"presumption in favor of arbitration" under federal law and called for "a summary and speedy disposition of motions or petitions to enforce arbitration clauses." *Century 21*, 965 So. 2d at 1036 (citation omitted). Notwithstanding this clear directive from the highest court in Mississippi, Judge Lackey still did not rule on the pending motions. It thus appears that Judge Lackey deliberately held off on ruling in the *Jones* case in the hope of finding evidence of a crime that had so far eluded him.

During this time, when Balducci and Judge Lackey spoke, it was always Judge Lackey who brought up the topic of the *Jones* case and the order on the motion to compel arbitration, not Balducci. When Balducci agreed to meet with Judge Lackey on May 9, 2007, in his chambers, Judge Lackey introduced the topic of the order. Ex. 10 at 2. When Judge Lackey called Balducci on May 21st, Judge Lackey introduced the topic of the order. Ex. 13 at 2. On August 9, 2007, it was again Judge Lackey that brought up the topic of the order. Ex. 11 at 2.

Just as Judge Lackey repeatedly brought up the topic of the order, Judge Lackey also repeatedly tried to implicate Scruggs by asking Balducci about Scruggs's knowledge or involvement.

- "What I want … to be certain is … if they are satisfied with this order … are they?" Ex. 22 at 32-33.

- "I just want to hear you say it again…. You and Scruggs [are the] only one[s who] know anything about this?" Ex. 13 at 4.

- "You think Dicky wants this thing in mediation, I mean … arbitration?" Ex. 11 at 15.

- "Does [Dick] want me to take care of it?" *Id*. at 15.

During the same time period, Balducci never mentioned Scruggs or the Scruggs Law Firm without Judge Lackey first having raised the topic.

Balducci never suggests that Lackey would be compensated or rewarded for an order in the *Jones* case. During this same time, not once did Balducci tell Judge Lackey that he would be rewarded with an "of counsel" position for ordering the *Jones* case to arbitration, much less offer

Judge Lackey money in exchange for such an order. In fact, the only suggestion that Balducci may have done so appears in Agent Delaney's September 26, 2007 affidavit, where he states that, during the supposed May 3, 2007 telephone call, Balducci "reaffirmed his offer to the judge of his becoming 'of counsel.'" Ex. 9 at 3. However, nothing about this statement suggests that Balducci was offering Judge Lackey the position *in exchange* for a favorable ruling. In fact, it appears that the job was there for Judge Lackey regardless how the *Jones* case came out.

      <u>Balducci makes it clear that Judge Lackey should decide the motion according to the law</u>. At the same time that Judge Lackey, acting as an agent of the government, was trying to implicate Balducci and Scruggs in something criminal, Balducci repeatedly made clear to Judge Lackey that he had no intention of improperly influencing him. During their May 21, 2007 conversation, Balducci repeatedly told Judge Lackey that he did not want to make Judge Lackey uncomfortable and that "if it's not something you feel right about, you do what your heart tells you." Ex. 13 at 4-5. Later, Balducci made clear that he expected Judge Lackey to make an independent decision about the arbitration order based on his own judgment. When Judge Lackey called Balducci on August 9, 2007, and asked if Scruggs wanted the case sent to arbitration, Balducci responded "yes sir … if … after you [see] it …. If you [see] it that way, that'd be terrific." Ex. 11 at 15-16 . These are hardly the words of someone who has bribed the judge.

      **3.      September 18, 2007-September 24, 2007:  The government creates the crime.**

      After nearly five months during which Balducci did not so much as suggest an improper *quid pro quo*, the government—and its agent Judge Lackey—were without a crime. Then beginning on September 18, 2007, the government suggested and instigated a criminal scheme by explicitly proposing a $40,000 payment. This is the crux of the government's outrageous conduct: blatantly manufacturing a crime where there was no evidence of a previously existing crime. Indeed, the crucial factor in evaluating the outrageousness of the government's conduct is the extent to which the government suggests the criminal activity. In *Twigg*, the Court found that the "illicit plan did not originate with the criminal defendants" but rather that the government's

agent "communicated with [the defendant] and suggested the establishment of a speed laboratory." *Twigg*, 588 F.2d at 380-811. The court in *Twigg* reversed the defendants' conviction.

The Court here should similarly dismiss the Indictment because there is no question but that the government—through its agent Judge Lackey—"suggested the establishment of" a scheme to provide Judge Lackey with a payment. *Id.* On September 18, 2007, Judge Lackey, knowing full well that his conversation was being recorded, called Balducci and told him that he had something to say that "may shock" Balducci. Ex. 12 at 3. Before he made his "shock[ing]" statement, though, Judge Lackey made clear for the recording who he was targeting: "I don't know him … don't know what his reaction might be one way or the other … and when I say 'his,' I'm talkin' 'bout Mr. Scruggs …." *Id.* at 4. Judge Lackey then got to the point: "If I help them, would they help me?" *Id.* at 5. Lackey went on to explain that he needed Balducci to "help me get over a little hump I've got." *Id.* at 7. On September 21st, Lackey went beyond merely "suggest[ing]" a payment and flatly asked for $40,000: "[S]o what I need, to tell you the truth … to get me over a hump, I need forty." Ex. 16 at 11.

Not only did Judge Lackey plainly instigate the alleged bribery, but he also pressured Balducci to agree to the crime. In *Greene*, the court reversed the defendants' bootlegging conviction in part because the agent "applied pressure to prod [defendants] into production of bootleg alcohol" by telling them that "the boss is on my back." *Greene*, 454 F.2d at 787. Similarly, in *Batres-Santolino*, the informant "stated to [the target] that the 'big man' was holding him responsible for the delay." *Batres-Santolino*, 521 F. Supp. at 749. Here, just as in *Greene* and *Batres-Santolino*, Lackey pressured Balducci to commit to the payment by telling him that he needed to pay "my folks that are pressuring me something by the weekend." Ex. 17 at 4. Judge Lackey also subtly suggested that if Balducci did not agree to his request, Judge Lackey would decide the arbitration motion in favor of the Jones firm. During their September 18th conversation, Judge Lackey told Balducci that Grady Tollison, the attorney representing the Jones firm was "puttin' some pressure … to get this thing done." Ex.12 at 6.

4.      **September 24, 2007-November 26, 2007: The government fails to disclose to this Court its extensive involvement in creating the alleged crime as well as evidence exculpatory to defendants.**

Having set in motion the alleged crime here, the government then expanded its surveillance activity and secured judicial assistance to do so by concealing from the Court its role in instigating the alleged bribery scheme and omitting evidence that showed that the purported conspiracy did not extend beyond Balducci and Patterson. The government's misleading statements to the Court made in furtherance of its pursuit of a manufactured crime aggravated its already outrageous conduct.

a.      **The September 26, 2007 Delaney Affidavit.**

On September 25, 2007, the day after Judge Lackey got Balducci to commit to the extortionate payment, the government applied for a wiretap on Balducci's cellular telephone. FBI Special Agent William P. Delaney's supporting affidavit, which appears to be dated the day after the wiretap application and order were filed, is replete with misleading statements and omissions of critical facts that exculpate both Balducci and Scruggs.[6]

Misleading summary of March 28, 2007 meeting.  After describing Judge Lackey and Balducci's telephone call and meeting on March 28th, Delaney's affidavit states that "[a]t the conclusion of the meeting, Judge Lackey called the U.S. Attorney's office and reported the matter to two senior AUSAs." Ex. 9 at 3. The suggestion that Judge Lackey called the government immediately is misleading. In fact, Judge Lackey admitted to the Wall Street Journal that he waited days before calling the government. Ex. 8. Thus, the government mislead the Court into thinking that Judge Lackey was so shocked and taken aback that he called the United States Attorney's Office immediately.

Material omission from summary of May 4, 2007 call.  Delaney omits that, during the May 4, 2007 call between Balducci and Judge Lackey, Balducci told the Judge that the proposed

---

[6] The false statements and omissions contained in the September 26, 2007 Delaney affidavit are detailed more completely in the accompanying Motion to Suppress, filed by defendants.

order he sent was "Just some thoughts, ideas, and suggestions ... I thought I'd put on paper ... see if His Honor ... might be interested in." Ex. 10 at 2.

Material omission from summary of May 9, 2007 meeting. Delaney omitted the fact that, when Balducci asked Judge Lackey whether he thought the SKG joint venture agreement required that the parties arbitrate, Judge Lackey responded "It does. It looks … like that's what they agreed to." Ex. 22 at 32.

Misleading summary of May 21, 2007 call. Delaney's affidavit fails to reveal that, during their May 21st telephone call, Judge Lackey baited Balducci to implicate Scruggs, saying "I just want to hear you say it again … you and Scruggs [are the] only one[s] who know anything about this?" Ex. 13 at 4. Delaney's affidavit also fails to disclose that Balducci said a number of times that he did not want Judge Lackey to do anything improper. Delaney fails to recount that Balducci told Judge Lackey: "you do what you feel comfortable with" and "I don't mean to make you uncomfortable; … if it's not something that you feel right about, you do what your heart tells you … I've got complete confidence that, that this is completely fine … I would never put … you nor me in that position … I have complete confidence that it's fine." *Id.* at 4-5, 7. Delaney's affidavit also fails to disclose that Balducci said during this conversation that "frankly I think we're right and I think that the law is on our side and I think probably had I never even approached you, we'd a probably had the right … result for us on this thing." *Id.* at 4-5.

Omission of Judge Lackey's Recusal. Delaney's affidavit omits entirely the fact that, on May 21, 2007, Judge Lackey notified counsel in the *Jones* case that he intended to recuse himself from hearing the case. *See* Ex. 14. Delaney also omits that on June 4, 2007, Judge Lackey sent counsel a second notice, announcing that he had reconsidered and would *not* recuse himself after all. *See* Ex.15. Delaney also fails to mention that, after Judge Lackey sent his first notice, Balducci did not contact him to urge that he reconsider. Dooley Decl. at ¶ 2. Delaney also does not disclose that days after he sent the recusal letter, Judge Lackey called Balducci, but Balducci did not call him back. *Id.*

Omission of Judge Lackey's aggressive pursuit of Balducci and Balducci's exculpatory statements from May 2007 to August 2007. Delaney further fails to disclose that Judge Lackey repeatedly contacted Balducci from May until September 2007, that Balducci did not call Judge Lackey, and that during their recorded calls and meetings there was no discussion of any plan or scheme to influence the Judge. For example, the affidavit does not mention at all a recorded call on May 29, 2007, during which Balducci told Judge Lackey that he only wanted Judge Lackey to do what the Judge thought the law required, saying: "I damn sure didn't want to do anything to jeopardize my relationship with you … I didn't want to do anything in the world ever to do that relationship any harm … I want to make sure that you and I are okay" and that "it would break my heart if I thought I had put you in a bad position … when you called the other night I could tell that you were troubled by it. That's why I told you 'do what your heart tells you …'" Dooley Decl. at ¶ 7. The affidavit also omits completely a recorded call on August 9, 2007, during which Judge Lackey re-introduced the topic of the motion to compel arbitration to Balducci and asked whether "Dicky" "wants this thing in mediation I mean … arbitration." Ex. 11 at 15. Balducci responded, "yes, … *if that's how you [see] it after you've taken a look at it, if you [see] it that way,* that would be terrific." *Id.* at 15-16 (emphasis added).

Misleading summary of the September 18 and 21, 2007, conversations and omission of the September 24, 2007 conversation. Delaney also omits the context in which Balducci asked for the $40,000 payment. Left out of his affidavit is the fact that Judge Lackey pressured Balducci to agree to the payment by suggesting that he (Judge Lackey) owed the money to people who were pressuring him for it. On September 18th, Judge Lackey told Balducci that he needed the money to "help me over a little hump I've got." Ex. 12 at 7. Then on September 21st, Judge Lackey told Balducci that his deadline for getting the money was October 1st but that, if he had half of it, "I could delay my misery …I think I can get them to put it off…" Ex. 16 at 12. Then on September 24th, to seal the deal, Judge Lackey called Balducci and asking

him, "[c]an I commit to my folks … that are pressurin' me, somethin' … by the weekend?" Ex. 17 at 4.[7]

> **b.  On September 27, 2007, Balducci made crystal clear that Dick Scruggs was not involved in the made-up crime.**

On September 27, 2007, Balducci paid Judge Lackey the $20,000 that Judge Lackey had pressured Balducci to provide by the weekend.  As usual, Judge Lackey expressly tried to get Balducci to implicate Scruggs.  But Balducci could not do it:

| | |
|---|---|
| Balducci: | …I want you know, though, … **this is just between you and me…** |
| Lackey: | Ok. |
| Balducci: | Ok?  **This is just between me and you**. |
| Lackey: | Alright. |
| Balducci: | **There ain't another soul in the world that knows about this, ok?  And this is, this is, this is taken care of …** |
| Lackey: | Yeah. |
| Balducci: | … ok? |
| Lackey: | You don't, **now I would think Mr. SCRUGGS would have to know something** … |
| Balducci: | Well, here… |
| Lackey: | …about it. |
| Balducci: | …here's how it works, just so you'll have some, some comfort, some understandin' of how it works.  Um, they'll come a time where I'll sit him down in private and I'll tell him that I solved a problem for him. |
| Lackey: | Alright |

Ex. 18 at 9-10 (emphasis added).

---

[7] Delaney also omits another statement of Judge Lackey's during this conversation designed to pressure Balducci.  Judge Lackey told Balducci that Grady Tollison, the attorney representing the Jones firm, was "putting some pressure … to get this thing done."  Ex. 12 at 6.  That statement suggests that, if Balducci did not agree to the payment, Lackey would decide the motion in favor of Tollison's clients.

Undeterred, Judge Lackey tried again later in the same conversation to implicate Scruggs in the payment arrangement he had instigated with Balducci.

| | |
|---|---|
| Lackey: | When you tell Mr. Scruggs or … Dickie or … whatever I ought to call him …You tell him that … this is a first time venture for me… |
| Balducci: | He is not even involved at that level judge… |
| Lackey: | Oh alright… |
| Balducci: | Frankly … I mean he doesn't even … like I said, the way this will work is I'll just go to him at some point in time and say that I cured a problem that you had and you need to recognize the problem that I have cured you've had … that's how it works. |
| Lackey: | Alright |
| Balducci: | He is not involved in a direct manner … doesn't want to be, doesn't need to be … |

Ex. 18 at 22. The government was thus aware that, while Balducci had agreed to Judge Lackey's extortionate request, Scruggs did not know of the agreement Judge Lackey had urged on Balducci. Indeed at the end of their September 27, 2007 meeting, Balducci told Judge Lackey, "you take comfort that this is between me and you. This doesn't go any further than this right here."

### c. The government failed to disclose Balducci's exculpatory statements to the Court.

As the government continued to pursue additional targets—including Dick Scruggs—in connection with the conspiracy that Judge Lackey had created, the government concealed from the Court Balducci's exculpatory statements of September 27, 2007. Indeed, after September 27th, the government came before this Court on four occasions to seek either wiretap approval or search warrants in connection with this investigation. *See* Ex. 20; Ex. 25. And on each of those occasions, the government, through an affidavit of Special Agent Delaney, represented that it had probable cause to believe that Scruggs was conspiring with Balducci and others to pay Judge Lackey. *See id.* Yet, not once did the government make the Court aware that Balducci, the purported bagman for the alleged bribery scheme, had specifically stated that Scruggs had no knowledge of the alleged scheme.

     **5.**       **November 1—November 19, 2007:  The government attempts to implicate the Scruggses and Backstrom.**

On November 1, 2007, the government confronted Balducci with the evidence it had collected pursuant to its targeted effort to engage him in a criminal scheme.  Balducci agreed to become a government agent.  From that point on, the government used Balducci the same way it used Judge Lackey before him: as an agent sent on a mission to create evidence of a criminal scheme that did not exist other than through the government's own machinations.

On the same day the government confronted Balducci, the government sent him to the Scruggs Law Firm wearing a body wire with a directive to implicate members of the Scruggs Law Firm in the made-up criminal scheme.  *See* Ex. 25 at 5.  During the course of his meetings, he attempted to implicate defendants by discussing payments to Judge Lackey as if defendants knew about them.  *Id.*  Evidently not satisfied that it had sufficiently implicated Backstrom, the government *again* instructed its agent Balducci to try to create evidence of yet another made-up crime.  On November 13, 2007, the government directed Balducci to make a recorded call to Backstrom at the Scruggs Law Firm.  Dooley Decl. at ¶ 8.  Yet, after eight months of efforts to find—and then create—evidence of a crime, the government was still left with only made-up conspiracies.

**C.**      **The Court should dismiss the Indictment.**

Defendants are faced with the rare "situation in which the conduct of law enforcement agents is so outrageous that due process principles … absolutely bar the government from invoking judicial processes to obtain a conviction."  *Russell*, 411 U.S. at 431-32.  Dismissal is warranted because defendants have demonstrated both "government *overinvolvement* in the charged crime" and have shown their "mere passive connection to the government orchestrated and implemented criminal activity."  *Duvall*, 846 F.2d at 973-74.  Indeed, from the outset of its investigation of Balducci continuing through to its efforts to implicate Dick Scruggs, Zach Scruggs and Sid Backstrom, the evidence above shows that there was never a conspiracy or other criminal scheme here except for that engineered and sustained by the government.  Thus, under

the line of cases stretching back to *Russell* and *Hampton*, the government's conduct offends Due Process, and the Court should not entertain this prosecution.

The Court should also apply the reasoning of the "fruit of the poisonous tree" doctrine to dismiss the Indictment against Dick Scruggs, Zach Scruggs, and Sid Backstrom as a sanction for the government's misconduct in creating the initial $40,000 payment scheme. The "fruit of the poisonous tree" doctrine, originally developed in the Fourth Amendment context, recognizes that the government is not permitted to exploit its own unconstitutional conduct. *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). "Under the 'fruit of the poisonous tree' doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation." *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998). The *Wong Sun* rule, however, is not limited to Fourth Amendment violations and has been applied to bar evidence obtained as a result of other constitutional violations. *See, e.g., United States v. Wade*, 388 U.S. 218, 241(1967) (holding that *Wong Sun* rule applies to Sixth Amendment violations).

The "fruit of the poisonous tree doctrine" also bars prosecution altogether where the government's case derives from outrageous conduct. *See United States v. Toscanino*, 500 F.2d 267, 275 (2d Cir. 1974); *see also United States v. Cyprian*, 23 F.3d 1189, 1197 (7th Cir. 1994). In *Toscanino*, the Second Circuit prohibited the government from prosecuting a defendant who was forcibly detained and brought within the jurisdiction of the court. The court held that dismissal was required because "the court's acquisition of power over [the defendant] represents the fruits of the government's exploitation of its own misconduct." *Toscanino*, 500 F.2d at 275. Similarly, in the *Cyprian* case, while the court did not find outrageous government conduct, it held that a defendant "has the right to challenge government conduct *causally related* to his conviction and thus has standing to raise an outrageous government conduct claim" as to the investigation of co-defendants. *Cyprian*, 23 F.3d at 1197 (emphasis added).

Here, the government's case against Dick Scruggs, Zach Scruggs, and Sid Backstrom derives from its outrageous conduct in pursing Balducci. While this is not a case of forcible detention like *Toscanino*, the same principle applies here: the Indictment against defendants is "the fruit of the government's exploitation of its own misconduct." *Toscanino*, 500 F.2d at 275. Similarly, there can be no doubt but that the government's outrageous conduct in stringing Balducci along until finally flat out creating a crime for him is "causally related" to the Indictment of Dick Scruggs, Zach Scruggs, and Sid Backstrom. *Cyprian*, 23 F.3d at 1197. Accordingly, the Court should dismiss the Indictment.

**D.      In the alternative, the Court should hold an evidentiary hearing.**

In the event the Court declines to dismiss the Indictment outright, the Court should hold an evidentiary hearing to resolve critical factual issues directly relevant to determining the extent of the government's outrageous conduct. In fact, "[m]ost often, conducting a hearing is the preferred course of action in cases where disputed factual issues exist" regarding a claim of government over-reaching and misconduct. *Cuervelo*, 949 F.2d at 567. The Second Circuit explained the reasons why a hearing is often required:

> It cannot be gainsaid that myriad facts and circumstances can arise in the complex context of what is commonly frequent and close interaction among government agents, witnesses and prospective defendants. A hearing allows for a searching inquiry into the particulars of the investigative process employed by the government, as the court undertakes to sort through the various conflicting claims, and permits factual determinations to be made by the district judge.

*Id*.

The Court should order a hearing at which Judge Lackey, Balducci, and Agent Delaney shall appear to testify to resolve at least the following questions:

- What precisely did Balducci say to Judge Lackey during the March 28, 2007 meeting regarding the "of counsel" position? As noted above, a critical factor in assessing government over-involvement is the extent of pre-existing criminality. *See, e.g.*, *Twigg*, 588 F.2d at 381. On the evidence the government has produced, there is no record that Balducci made any improper overture to Judge Lackey on

March 28, 2007, or anytime thereafter and thus it appears that there was no existing crime that the government was investigating while it pursued Balducci. A hearing will allow the Court to resolve this issue.

- What instructions was Judge Lackey given by the government over the course of May-September 2007, as the government tried to implicate Balducci in a scheme involving the *Jones* case?

- Is there other exculpatory evidence that was not provided to the Court during the course of the government's investigation? As noted above, the government's recent production of its audio recordings has uncovered evidence exculpating defendants that the government previously failed to provide to the Court.

- What information did Balducci provide to the government on November 1, 2007 before the government sent him in to the Scruggs Law Firm on a mission to create evidence of a crime? As with Judge Lackey's pursuit of Balducci, it appears that none of the defendants that Balducci tried to implicate were knowing participants in an existing scheme at that point.

To resolve these and other related questions, defendants respectfully request that the court hold an evidentiary hearing.

## IV.    CONCLUSION

For the foregoing reasons, defendants Richard F. Scruggs, David Zachary Scruggs, and Sidney A. Backstrom respectfully request that the Court dismiss the Indictment based on the government's violation of the due process clause of the Fifth Amendment.

Defendants respectfully request oral argument on this motion.


Dated:  February 11, 2008　　　　　　　　By:　/s/ John W. Keker
　　　　　　　　　　　　　　　　　　　　John W. Keker (*Pro Hac Vice*)
　　　　　　　　　　　　　　　　　　　　Jan Nielsen Little (*Pro Hac Vice*)
　　　　　　　　　　　　　　　　　　　　Brook Dooley (*Pro Hac Vice*)
　　　　　　　　　　　　　　　　　　　　Travis LeBlanc (*Pro Hac Vice*)
　　　　　　　　　　　　　　　　　　　　Warren A. Braunig (*Pro Hac Vice*)
　　　　　　　　　　　　　　　　　　　　KEKER & VAN NEST, LLP
　　　　　　　　　　　　　　　　　　　　710 Sansome Street
　　　　　　　　　　　　　　　　　　　　San Francisco, California 94111
　　　　　　　　　　　　　　　　　　　　Telephone: (415) 391-5400
　　　　　　　　　　　　　　　　　　　　Facsimile:  (415) 397-7188

　　　　　　　　　　　　　　　　　　　　*Co-Counsel for Defendant*
　　　　　　　　　　　　　　　　　　　　*Richard F. Scruggs*

Dated:  February 11, 2008　　　　　　　　By:　/s/ Frank W. Trapp
　　　　　　　　　　　　　　　　　　　　Frank W. Trapp, MSB #2261
　　　　　　　　　　　　　　　　　　　　PHELPS DUNBAR
　　　　　　　　　　　　　　　　　　　　P.O. Box 23066
　　　　　　　　　　　　　　　　　　　　Jackson, Mississippi 39225-3066
　　　　　　　　　　　　　　　　　　　　Telephone: (601) 352-2300

　　　　　　　　　　　　　　　　　　　　*Co-Counsel for Defendant*
　　　　　　　　　　　　　　　　　　　　*Sidney A. Backstrom*

Dated:  February 11, 2008　　　　　　　　By:　/s/ J. Rhea Tannehill, Jr.
　　　　　　　　　　　　　　　　　　　　J. Rhea Tannehill, Jr., MSB #10449
　　　　　　　　　　　　　　　　　　　　TANNEHILL & CARMEAN, PLLC
　　　　　　　　　　　　　　　　　　　　829 North Lamar Boulevard, Suite 1
　　　　　　　　　　　　　　　　　　　　Oxford, Mississippi 38655
　　　　　　　　　　　　　　　　　　　　Telephone: (662) 236-9996
　　　　　　　　　　　　　　　　　　　　Facsimile:  (662) 234-3949

　　　　　　　　　　　　　　　　　　　　*Co-Counsel for Defendant*
　　　　　　　　　　　　　　　　　　　　*Sidney A. Backstrom*

Dated:  February 11, 2008　　　　　　　　By: /s/ Todd P. Graves
　　　　　　　　　　　　　　　　　　　　Nathan F. Garrett (*Pro Hac Vice*)
　　　　　　　　　　　　　　　　　　　　Todd P. Graves (*Pro Hac Vice*)
　　　　　　　　　　　　　　　　　　　　GRAVES BARTLE & MARCUS, LLC
　　　　　　　　　　　　　　　　　　　　100 Main Street, Suite 2600
　　　　　　　　　　　　　　　　　　　　Kansas City, Missouri 64105
　　　　　　　　　　　　　　　　　　　　Telephone: (816) 256-3052
　　　　　　　　　　　　　　　　　　　　Facsimile:  (816) 817-0780

　　　　　　　　　　　　　　　　　　　　*For Defendant*
　　　　　　　　　　　　　　　　　　　　*David Zachary Scruggs*

**CERTIFICATE OF SERVICE**

I, Brook Dooley, do hereby certify that I have electronically filed the foregoing

**Defendants' Motion to Dismiss the Indictment for Outrageous Government Conduct With**

**Combined Memorandum of Law** with the Clerk of the Court using the ECF system, which sent

notification for such filing to Thomas W. Dawson, Assistant United States Attorney, Robert H.

Norman, Assistant United States Attorney, David Anthony Sanders, Assistant United States

Attorney, Frank W. Trapp, J. Rhea Tannehill, Jr., Nathan F. Garrett, and Todd P. Graves.

This, the 11th day of February, 2008.

/s/ Brook Dooley
Brook Dooley